IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| PUBLIC CITIZEN, INC., ) | Case No. CV 08-0833 (MHP) |
| ) | |
| CONSUMERS FOR AUTO RELIABILITY ) | |
| AND SAFETY, and ) | DECLARATION OF |
| ) | STEVEN A. TATERKA |
| CONSUMER ACTION, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| MICHAEL MUKASEY, ) | |
| Attorney General of the United States, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**DECLARATION OF STEVEN A. TATERKA**

I, Steven A. Taterka, declare as follows:

1.  I reside at 305 Woodlands Drive, Kingston Springs, TN 37082. I make this declaration in support of plaintiffs' motion for summary judgment in this action.

2.  I am a member of Consumers for Auto Reliability and Safety ("CARS"). I am also a member of the CARS Advisory Board and have been so for 12 years. I have also contributed to Public Citizen, Inc., since the 1990's.

3.  I am an attorney admitted to practice in Wisconsin, Alabama, the District of Columbia, Indiana and Tennessee. From 1977 to 1988 I worked for Legal Services Corporation funded programs in Alabama and Wisconsin representing low income clients. My focus was on consumer law problems, many of which involved automobiles.

Often I represented consumers who had purchased motor vehicles which were later determined to have suspect histories. In those days there were no publicly available databases by which consumers could easily determine whether a vehicle had previously been declared a salvage or flood vehicle. To investigate a vehicle's history one was required to obtain title history documents from state motor vehicle agencies, a tedious process.

   4. From 1988 to 1993 I worked in the Indiana Attorney General's office. I was a section chief in the consumer protection division primarily handling cases involving motor vehicle sales practices. I routinely reviewed consumer complaints from the public and thus became acutely aware of the many vehicles with suspect histories that were sold to unsuspecting consumers. Through the National Association of Attorneys General I had contact with my counterparts in other states and learned of the many similar problems they were experiencing. Accordingly, in 1991 I drafted proposed legislation, subsequently enacted by the Indiana General Assembly (currently codified at Indiana Code 9-22-3-1 *et seq.*), which set forth criteria and procedures by which insurers were required to declare vehicles as salvage.

   5. From 1993 to 1995 I worked in the Tennessee Attorney General's office. I worked as an assistant attorney general in the consumer protection division, also handling cases involving motor vehicle sales practices. In 1994, I testified on behalf of the office before the Subcommittee on Commerce, Consumer Protection and Competitiveness of the Committee on Energy and Commerce in the U.S. House of Representatives in support of H.R. 3713, the proposed Salvage Vehicle Title Reform and Highway Safety Act which was introduced by Rep. Alan Wheat. That bill would

have prescribed uniform definitions with respect to salvage vehicles nationwide, point of sale disclosure to prospective buyers and other protections designed to prevent consumers from unknowingly acquiring previously salvaged vehicles.  In my testimony I stated that some dealers or rebuilders will "wash" a salvage title through a state that doesn't have adequate procedures in place to brand titles with a rebuilt vehicle designation or through a state that doesn't carry over out-of-state title brands.  I also pointed out that rebuilders do not always accurately disclose to a State motor vehicle division the extent of repairs made to a vehicle.

6. Since 1995 I have been in private practice focusing on consumer law issues, including motor vehicle sales practices.  I have represented consumers who purchased prior salvage or flood vehicles and were not given disclosure prior to purchase.  In one case my client purchased a vehicle which had incurred over $7,800 in damages but the rebuilder indicated "no parts used" on the appropriate form filed with the State upon "repair" and thus converting a salvage title to a roadworthy title.  Indeed, the airbag system and seat belt tensioners were not functioning.  In my opinion, the common thread in this and other cases is that consumers do not have a practical, publicized and reliable way to ascertain the prior history of vehicles which could provide them with sufficient, vehicle-specific information to avoid purchase of unsafe vehicles.

7. I am familiar with Congress' enactment of the National Motor Vehicle Information System ("NMVTIS"), originally enacted in 1992.  As originally enacted, the Department of Transportation was tasked with the responsibility of promulgating implementing regulations.  In 1996 Congress amended NMVTIS and transferred responsibility for promulgating the regulations to the Department of Justice.  I think it is

unfortunate that at this late date there is still no functioning NMVTIS database by which consumers can determine whether a vehicle they are considering for purchase has been denominated as a total loss by an insurance company due to collision or flood damage.  The clients I have represented are no doubt the tip of the iceberg of consumers who are unable to obtain this information.

8.     While there are commercial databases (Carfax at www.carfax.com and Experian's Autocheck at www.autocheck.com) available which contain some title branding information, these databases are not all-inclusive.  The ability of these databases to obtain insurance company total loss information is subject to a variety of factors including inconsistent state laws with respect to what constitutes a salvage or junk vehicle, inconsistent title branding requirements, varying language used in title brands and brand carryover, or lack thereof, from one state to another.  Indeed, I think the existence of Carfax and Autocheck create a false sense of security among consumers who use these databases since Carfax and Autocheck marketing do not disclose the gaps in their coverage.  Consequently, I believe the only way to ensure that consumers have access to complete total loss vehicle history information is to implement NMVTIS as quickly as possible.  Information in the NMVTIS database would come directly from the insurance companies that declare vehicles as total losses and thus would not be subject to the whims of rebuilders or varying state laws.

9.     Recently my former part-time secretary advised me that she and her husband wished to purchase a used motor vehicle.  Armed with knowledge gained by working for me for several years, (*e.g.*, ask to see the title to check for a title brand, verify that the title is in the same name as the seller, check the title date of issuance to

ensure that the seller isn't just "flipping" the car, peruse the car advertisements from a week or so earlier to look for the same seller phone number, and obtain a Carfax or Autocheck report since one is still not available through NMVTIS) she called several sellers inquiring about used vehicles for sale. Much to her dismay, an inordinate number of the sellers were curbstoners, *i.e.*, sellers purporting to sell their personal vehicles when, in fact, they were in the business of selling vehicles without a valid motor vehicle dealer license. Since these sellers lied about their status as sellers, she hardly had any faith in their representations about the vehicles. The existence of a functioning NMVTIS database would provide her with the requisite information to weed out total loss vehicles.

10. I currently own a 1993 Ford with over 273,000 miles and a 1995 Ford with over 300,000 miles. Given the mileages on these vehicles, I have been considering the purchase of a replacement used motor vehicle for some time. However, based on what I know goes on in the marketplace and the lack of a comprehensive database of salvage and flood car information such as prescribed by Congress when it enacted NMVTIS, I am reluctant to make a purchase. Consequently I continue to drive vehicles which may be nearing the end of their useful lives.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Kingston Springs, Tennessee, on August 31, 2008.

/s/ Steven A. Taterka
Steven A. Taterka